2022 IL App (1st) 220222

SIXTH DIVISION
November 4, 2022

No. 1-22-0222

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* D.L., Jr., & C.L, Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos.  14 JA 338 & |
| v. | ) | 14 JA 339 |
| | ) | |
| T.S., | ) | The Honorable |
| | ) | Peter Vilkelis, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Presiding Justice Mikva dissented, with opinion.

**OPINION**

¶ 1     Respondent-appellant T.S. appeals from an order of the circuit court of Cook County

finding her unfit to parent D.L., Jr., and C.L., minors. For the following reasons, we reverse the

judgment of the circuit court.[1]

---

[1]Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), the deadline for disposition in this case was July 11, 2022. Due to requested extensions in the briefing schedule, appellant's reply brief was not filed until August 8, 2022. Because of delays in briefing and subsequent changes in the composition of this court, this disposition is issued after the deadline provided for in Rule 311.

¶ 2                              I. BACKGROUND

¶ 3     T.S. is the mother of D.L., Jr., a boy born in September 2012, and C.L., a boy born in August 2013. The boys' father is not a party to this appeal.

¶ 4     On April 2, 2014, the State filed petitions for adjudication of wardship for the boys, alleging that they were abused and neglected pursuant to sections 2-3(1)(a), (1)(b), and (2)(ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (1)(b), (2)(ii) (West 2014)). The boys were removed from T.S.'s care and placed with their foster parents, K.C. and N.S.

¶ 5     On October 6, 2014, the circuit court found both boys neglected due to an injurious environment and abused due to a substantial risk of physical injury. The circuit court also found that D.L. was neglected due to lack of care. The basis for the circuit court's findings was D.L.'s nonorganic failure to thrive diagnosis, as well as domestic violence between T.S. and the minors' father that resulted in T.S. locking herself and D.L. in the bedroom with a knife and threatening to kill herself. T.S. had been drinking and used alcohol to calm down. T.S. was subsequently hospitalized for psychiatric care.

¶ 6     In December 2014, the trial court held a permanency planning hearing. A permanency goal was set for the boys to return home within 12 months. That goal was repeatedly re-set at periodic permanency planning hearings until August 31, 2018, when the circuit court changed the goal to substitute care pending termination of parental rights. This court denied T.S.'s petition for leave to appeal the change in permanency goal.

¶ 7     In 2019, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. The petition alleged that T.S. was unfit to parent the boys under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)), because she failed to maintain a reasonable degree of interest in, concern for, or responsibility for the boys, and under

section 1(D)(m) of the Adoption Act (*id.* § 1(D)(m)), because she failed to make reasonable efforts to correct the conditions that were the basis for removal of the boys or failure to make reasonable progress toward the return of the boys within any nine-month period after the adjudication of neglect. A hearing was held on T.S.'s fitness to parent the boys. The evidence adduced at the hearing is summarized as follows.[2]

¶ 8    Kathye Sellers testified that she was a caseworker with Children's Home & Aid (the Agency) who had been assigned to this case since 2014. T.S. was recommended for numerous services, including a parenting capacity assessment, parent coaching, parenting classes, individual therapy, domestic violence services, and drug education and screening. T.S. successfully completed each of these services. In 2017, T.S. was referred for child-parent psychotherapy (CPP) to improve her bond with the boys. However, the CPP therapist left the Agency after three or four sessions, before the CPP could be completed. In 2018, due to ongoing attachment issues between the boys and T.S., the Agency recommended them for family counseling with Dr. Julie Brosnan, the boys' therapist at DePaul Family and Community Services (DePaul). In May 2018, family counseling was terminated, and visits between T.S. and the boys were suspended.

¶ 9    T.S. had been consistent with visits since 2015, about nine months after the opening of the case. In 2015, visitation was increased to twice a week for two hours. The visits were initially supervised before eventually becoming unsupervised. The visits were always held at the Agency.

_____

[2]In her brief, T.S. argues that the trial court took judicial notice of all testimony that was given in earlier hearings in this case, and accordingly references evidence not introduced at trial. This evidence cited by T.S. favored her, and includes, for example, expert testimony from Dr. Tiffany Masson, a psychologist who testified regarding Dr. Brosnan's conflict of interest and the importance of CPP; a letter from Dr. Brosnan to Sellers opposing visitation, written in 2018 before family therapy began; and testimony from Dr. Brosnan that the boys "care for their mother [T.S] and she cares for them." The State responds that the trial court took judicial notice only of its findings at the permanency hearing. Because we find that the evidence introduced at trial was insufficient to prove T.S.'s unfitness to parent clearly and convincingly, we need not resolve this argument regarding additional evidence.

After three to four unsupervised visits in December 2016, supervised visitation was reinstated because K.C. reported negative impacts on the boys' behavior. In April 2017, the circuit court entered another order for unsupervised visits, but that order was not implemented until November 2017. In November 2017, T.S. and the boys began having unsupervised visits twice a week. After family therapy started in 2018, family therapy constituted one of the visits. In March 2018, visitation was changed back to supervised due to D.L.'s behavior. Visitation was subsequently suspended completely, again due to the boys' behavior.

¶ 10    Sellers observed several visits. The minors could be clingy toward the foster parents before visits, but once they were separated from the foster parents their visits with T.S. went well. D.L. wanted to visit with T.S. but C.L. would be shy. Sellers never observed the extreme behavior in the boys that K.C. reported. The boys did not understand that T.S. was their natural mother. The Agency did not give T.S. the opportunity to have visits at locations outside of the Agency, other than joint birthday parties that T.S. threw for the boys (whose birthdays are one month apart) at Chuck E. Cheese.

¶ 11    Sellers received letters from Dr. Brosnan recommending against CPP and family therapy. Nevertheless, the circuit court asked Dr. Brosnan to provide family therapy and she agreed. After six sessions of family therapy were completed, Dr. Brosnan sent Sellers a letter stating that family therapy was terminated due to lack of improvement in the boys' behavior.

¶ 12    Dr. Brosnan testified that she was a supervising psychologist on D.L.'s and C.L.'s case at DePaul. The foster parents contacted DePaul in 2015 for D.L. to receive comprehensive services. At that time Dr. Brosnan understood that the foster parents were hoping to adopt the boys, but later came to realize that the goal for the case was to return the boys to T.S.

4

¶ 13    Initially D.L. was brought in for excessive whining and tantrums. By the summer of 2016, D.L. had made enough progress to consider discontinuing services, but the foster parents soon reported that D.L. was experiencing escalated behavior issues such as bedwetting, aggression, and sexualized behaviors, so services continued. C.L. began services in 2017 after showing anxiety and bedwetting. This therapy sometimes involved the foster parents, but not T.S.

¶ 14    Dr. Brosnan, who was not trained in CPP, wrote letters to Sellers recommending against CPP. CPP is a "trauma intervention" therapy that is recommended for children who have been separated from their birth parents. It involves creating a narrative around birth history and the history of neglect or abandonment. CPP was recommended by T.S.'s individual therapist and in a 2017 parenting capacity assessment for T.S., as well as in the psychological evaluations for the boys from Children's Research Triangle (CRT). Dr. Brosnan acknowledged that the three or four sessions of CPP in 2017 were not sufficient to show its efficacy.

¶ 15    In 2018, at the circuit court's request, Dr. Brosnan agreed to provide another type of family therapy to T.S., the foster parents, and the boys. The type of family therapy led by Dr. Brosnan is Child Adult Relationship Enhancement (CARE), which employed worksheets to encourage interaction and focused on strategies to increase the boys' compliance and decrease problematic behaviors. The CARE therapy was child-led, meaning that the minors chose the activity and with which adults to interact, and involved the foster parents and T.S. The minors interacted with everyone. T.S. was "passive, but pleasant" and interacted silently with the boys throughout the six family therapy sessions. Dr. Brosnan stated that she gave both the foster parents and T.S. a handout with "sentence stems" to facilitate conversation with the boys, but T.S. did not utilize it. T.S. did not do anything during the sessions to trigger the boys' behavior, nor did the boys act out during the therapy sessions. Dr. Brosnan never saw the boys display any of the extreme behaviors reported

by the foster parents during the family therapy sessions, although once during a visit D.L. touched himself inappropriately for approximately 15 seconds, and T.S. did not redirect him.

¶ 16    Dr. Brosnan stated that she did not write a letter to Sellers recommending against family therapy. Counsel for T.S. introduced a letter from Dr. Brosnan stating that "due to judge's request for DePaul Family and Community Services to provide family therapy *** family therapy is not recommended." Dr. Brosnan stated that this letter referred to CPP.

¶ 17    Dr. Brosnan testified that T.S. had to travel "a far way" to attend the CARE sessions at DePaul. The foster parents also attended every CARE session.

¶ 18    Dr. Brosnan terminated family therapy after six sessions over the course of three months. At first Dr. Brosnan testified that family therapy was terminated because the minors' psychological distress was not decreasing, and she believed the stress of the visits was influencing the boys' symptoms. When Dr. Brosnan was later recalled to the stand, she stated that family therapy was terminated due T.S.'s failure to progress because T.S. was not interacting with the boys during play as much as she hoped.

¶ 19    Dr. Brosnan hypothesized that T.S. herself was a trigger for the boys' trauma and that was the reason for the boys' disruptive behavior at home. However, Dr. Brosnan testified that the boys have never stated memories of living with T.S. Dr. Brosnan believed that the bond between T.S. and the boys was "nonexistent."

¶ 20    K.C. testified that she and her husband, N.S., had been foster parents to the boys since they were first placed in their care in April 2014. At that time, C.L. was eight months old and D.L. was 18 months old. K.C. had the boys call her and N.S. "mom" and "dad." The boys were not aware that K.C. and N.S. were not the boys' natural parents until late 2017. When the CPP therapist attempted to discuss this with the boys, D.L. became disturbed. K.C. had been to about 50

individual therapy sessions with D.L. and about 50 individual therapy sessions with C.L. at DePaul.

¶ 21    K.C. noticed the boys' negative behaviors increasing in intensity and frequency in September 2016, around the time that visits with T.S. were increased from once to twice a week and K.C. had begun transporting them to visits at the Agency. A case aide asked K.C. to stay in the parking lot rather than bringing the boys into the Agency to try to reduce the boys' clinginess. C.L. would try to resist visits and experienced sleep disruptions and toilet training regression. C.L. also stuttered, engaged in repetitive behaviors, and would have serious "meltdowns." D.L. would hurt himself and talk about hurting or killing himself. D.L. would also talk about wanting to hurt or kill T.S. D.L. became more physically aggressive, compulsively masturbated, and experienced sleep disruptions. The behaviors were concentrated around times of visitation, and eventually D.L. would try to resist attending visits. On one day in May 2018, D.L. defecated repeatedly on the ground before a visit with T.S. and was unable to be redirected. Visits were subsequently suspended.

¶ 22    Both boys were better able to "self-regulate" following the suspension of visits with T.S. in June 2018. A month after family therapy was terminated and visits were suspended, the boys' aggression and suicidal and homicidal statements decreased in frequency. The boys' sleep disruptions had also ceased.

¶ 23    T.S. was supposed to call K.C. weekly between November 2017 and June 2018 to discuss the boys but only called four times. However, T.S. sent text messages to K.C., including annually on the boys' birthdays. T.S. and K.C. have met in person about five times over the course of three years, but the in-person meetings stopped once the Covid-19 pandemic started.

¶ 24    T.S. testified that she is the natural mother of the boys and two other girls, J.B. and E.S., who are not in foster care. J.B., born in October 2010, resides with her natural father. E.S., born in December 2015, resides with T.S. and her natural father, with whom T.S. is in a relationship. T.S. works 50-60 hours a week as a certified nursing assistant. T.S. recounted the reasons for DCFS involvement and why the boys were placed in foster care, including the domestic violence with the boys' father, her inability to regulate her emotions, her use of alcohol, and D.L.'s failure to thrive. T.S. willingly and successfully participated in all her services. She had learned about the reasons the children were placed in care and addressed those issues with new skills.

¶ 25    T.S. played with the boys at visits and would watch television with them. C.L. would tell her he loved her and that she was the "best mommy in the world." T.S. would bring snacks to the visits. She believed the boys enjoyed the visits, although they could be reluctant in the beginning. She did not redirect D.L. when he was touching himself because it lasted a short time, and she did not think it was a big deal. In family therapy, T.S. would play with the boys and interact verbally with them. She was not silent. She was uncomfortable in family therapy because the foster parents and Dr. Brosnan had an established relationship, but she worked through it. T.S. would contact Dr. Brosnan weekly, but Dr. Brosnan did not always promptly return her calls. T.S. called K.C. weekly when visits were ongoing and monthly after visits were suspended. T.S. would reach out to K.C. on the boys' birthdays every year and threw three joint birthday parties for them at Chuck E. Cheese.

¶ 26    Also entered into evidence were the DCFS service plans from 2014 through 2019, assessments from T.S.'s substance use and parent coaching programs, a report from T.S.'s individual therapist, two parenting capacity assessments, and psychological evaluations of each of the two boys from CRT.

¶ 27    The 2017 Cook County Juvenile Court Clinic (CCJCC) parenting capacity assessment stated that T.S. attended 63 individual therapy sessions between December 2014 and August 2016 and cancelled four sessions in this time. From September 2016 through May 2017, T.S. missed one session of therapy due to work conflict. T.S.'s therapist stated that she had gained insight into the issues that led to this case.

¶ 28    The CCJCC report stated that in 2015, T.S. completed a 15-hour parenting class in which she obtained a prescore of 88% and a postscore of 94%, both above class averages. T.S. also completed a second, 16-hour parenting class in 2015. From June to December 2016, T.S. spent two hours per week completing a 55-lesson parent coaching curriculum. The parent coach observed 24 visits between T.S. and the boys as part of this curriculum and noted "just the opposite" of a deterioration in the boys' behavior. In her final parenting coaching evaluation, T.S. showed improvement in all categories, being rated average or above average for each skill evaluated.

¶ 29    The CCJCC report called into question a previous evaluation and report from a Dr. Gardner who speculated that T.S. had features of a personality disorder and autism spectrum disorder, stating that T.S. did not appear to meet criteria for any personality, mental, or intellectual disorder.

¶ 30    The overall findings of the CCJCC report were that T.S. had shown improvement in her parenting skills, such as disciplining the boys and addressing their emotions. T.S. had also made progress in addressing the reasons for DCFS involvement. T.S.'s increased parenting knowledge was identified as a strength in parenting. Many of the risks associated with T.S.'s parenting, such as her history of mental illness, domestic violence, and substance abuse had been addressed by T.S. through the completion of services and no longer appeared to be at issue. However, the boys' special needs continued to be a risk factor. The report found a "moderate to high" likelihood that

T.S. could achieve the goal of return home. While the CCJCC report acknowledged the foster parents' reporting that the boys' dysregulation occurred around the time visitation was increased, ultimately the report found there was "[n]o clear indication of why the children's behavior has deteriorated." The report noted that other changes had occurred around the same time, including D.L. seeing a new therapist, T.S.'s new paramour attending visits, and N.S. starting to work outside of the home.

¶ 31    Dr. Brosnan referred the boys for evaluations with CRT.[3] The CRT report for D.L. stated that "placement uncertainty" was the source of D.L.'s anxiety. The report stated that visits with T.S. aggravated this anxiety and recommended that permanency be established as soon as possible. The CRT report for C.L. also emphasized the need for stability "because the current uncertainty and conflicting information [C.L.] has is contributing to anxiety and stress that negatively impacts his current and future physical and emotional health and well-being." Both CRT reports reiterated that the boys were at increased risk of mental illness and cognitive delays due to their traumatic background and affirmed the need for support services, therapy, and caregiver education to ensure the boys' continued development.

¶ 32    In an oral ruling, the circuit court found that the mother had completed each of her recommended services except family counseling. The circuit court commended T.S. for the strides she had made, stating that she was in a better place now with a new relationship and caring for E.S. The circuit court found that Sellers, Dr. Brosnan, T.S., and K.C. were all credible witnesses.

---

[3]It is important to note that the main background source for the boys' CRT reports was K.C. T.S. was not interviewed for either report. Sellers also provided information for C.L.'s report, and various case records were examined for both reports. The CRT reports accordingly base many findings on K.C.'s statements, some of which appear to be contradicted by other testimony in the record. For example, the CRT report for D.L. raises concerns regarding T.S.'s negative reaction when D.L. touched himself inappropriately. However, T.S. and Dr. Brosnan testified that T.S. did not react to or redirect D.L. during that incident.

Although T.S.'s theory at trial was that Dr. Brosnan and K.C. were biased and attempting to facilitate the boys' adoption by K.C. and N.S., the circuit court did not credit this view.

¶ 33 As to section 1(D)(m), the court found that while it seemed that T.S. had recovered from the trauma that led to this case, the boys had not. Reading in part from the CRT evaluations, the circuit court went on to state that both D.L. and C.L. had overwhelming fear and anxiety regarding separation from the foster parents. Given that the foster parents were the only "functional parents" that D.L. and C.L. had known, separation from them would be highly traumatic. And as to D.L., the circuit court found that the fear of separation was "likely contributing to the regression in his behavior and the worsening of his behavior symptoms during times around visits with his mother." The circuit court concluded that despite its efforts to return the boys to T.S., "the children's experiences, their trauma prevented that from happening." Finally, the circuit court stated that T.S. was "a trigger for the boys to relive the trauma that they experienced while in her and [the father's] care. On that basis, [T.S] may have made reasonable efforts. But this court finds that she was unable to make reasonable progress ***."

¶ 34 As to section 1(D)(b), the court found that T.S. placed four phone calls to K.C. in a year, which did not show a reasonable degree of interest, concern, or responsibility in the boys.

¶ 35 The case proceeded to a best interests hearing. The court found that it was in both boys' best interests to terminate T.S.'s parental rights and involuntarily terminated them.

¶ 36 T.S. filed a timely notice of appeal.

¶ 37                                    II. ANALYSIS

¶ 38 T.S. argues that the State failed to prove by clear and convincing evidence that she was unfit to parent D.L. and C.L. under either section 1(D)(m) or 1(D)(b) of the Adoption Act.

¶ 39    The right of parents to the care, custody and companionship of their children "is perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. See *Troxel v. Granville*, 530 U.S. 57, 66 (2000); accord *In re M.M.*, 2016 IL 119932, ¶¶ 27-28. It is an interest "far more precious than any property right" and is therefore protected by the substantive due process guarantee of the fourteenth amendment of the federal constitution. *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982).

¶ 40    In *In re C.W.*, 199 Ill. 2d 198, 210 (2002), our supreme court explained that

> "[T]he involuntary termination of parental rights involves a two-step process. First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act [citation]. If the court makes a finding of unfitness, the court then considers whether it is in the best interests of the child that parental rights be terminated."

The State must prove unfitness of a parent by clear and convincing evidence. *In re H.S.*, 2016 IL App (1st) 161589, ¶ 23. We review the circuit court's finding of unfitness against the manifest weight of the evidence standard. *Id.* We will not reverse the circuit court's decision unless the opposite conclusion is clearly evident. *Id.* In short, a reviewing court must apply the manifest weight of the evidence standard to the heightened burden of proof in a termination case. See *In re J.O.*, 2021 IL App (3d) 210248, ¶ 33.

¶ 41         A. T.S. Made Reasonable Progress Toward the Boys' Return Home

¶ 42    The circuit court found that while T.S. had made reasonable efforts to correct the conditions that led to removal, T.S. was unfit on the grounds that she had failed to make reasonable progress towards the return of D.L. and C.L. during any nine-month period from December 2014 through April 2019.

¶ 43 A parent's failure to make "reasonable progress" toward the return of their child can support a finding of unfitness. *H.S.*, 2016 IL App (1st) 161589, ¶ 24 (citing 750 ILCS 50/1(D)(m)(ii) (West 2014)). "Reasonable progress toward the return of the child is judged on an objective standard that focuses on the steps *the parent* has taken toward reunification. [Citation.] At minimum, *the parent* must make demonstrable movement toward the goal of returning the child home." (Emphases added.) *Id.* ¶ 27 (citing *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002)).

¶ 44 " '[F]ailure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication ***." 750 ILCS 50/1(D)(m)(ii). But the condition that triggered removal of the child is not the only condition a parent need ever address in order to demonstrate movement toward the goal of reunification. *In re C.N.*, 196 Ill. 2d 181, 213 (2001).

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17.

¶ 45 There is no dispute that T.S. successfully completed all her services except family therapy, made progress in those services, and made reasonable efforts to resolve the conditions that led to the boys' removal in 2014. There is similarly no dispute that T.S. acknowledged responsibility for the circumstances that brought about the boys' removal from her care. Rather, the State and minors argue, and the circuit court found, that T.S. was a "trigger" for the boys' trauma and associated

behavioral issues. The question on appeal is whether it was against the manifest weight of the evidence for the circuit court to find that T.S. failed to make reasonable progress toward reunification based on the boys' response to T.S.'s visits.

¶ 46    We find that the circuit court erred in relying on evidence of the boys' psychological distress to find that T.S. did not make reasonable progress under the statute. In doing so, the circuit court conflated its view of the best interests of the boys with T.S.'s fitness to parent. "When ruling on parental unfitness, a court is not to consider the child's 'best interests.' " *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). At a fitness hearing, "it is *the parent's* past conduct in the then-existing circumstances that is under scrutiny." (Emphasis added.) *Id.* The child's current well-being and the prospective effect that termination of parental rights and adoption of the child will have on the child are not relevant in determining the fitness of the parent. *Id.*

¶ 47    Although the circuit court found that T.S. failed to make reasonable progress towards reunification with the boys, the central basis for the court's finding was that *the boys* were not making significant progress in reducing their reactions to T.S.'s visits. The evidence showed that the boys had negative emotional and behavioral responses after increased visitation with T.S. and experienced a reduction in these responses when visitation was decreased. The evidence also showed that the boys were anxious due to the instability in their home life and overwhelmed by the prospect of being separated from their foster parents. But this evidence regarding the children's current well-being and the effect that termination may have on them is relevant only to a determination of the children's best interests. The circuit court erred in using this evidence to support a finding that T.S. is unfit. In a fitness hearing, the circuit court must focus on *the parent's* conduct. The court may not consider the possibility that termination of the parent's rights may improve the situation of the child. As concerning as the boys' distress is, their actions in the foster

home outside of T.S.'s presence are not a basis for a finding of unfitness on the part of T.S. This is so even where the circuit court finds that visitation with T.S. appears to exacerbate the boys' behavioral problems.

¶ 48     Our decision finds support in a remarkably similar case. In *In re O.G.*, 159 N.E.3d 36 (Ind. Ct. App. 2020), the natural mother's parental rights were terminated, and the minor child was adopted to his foster family despite a pending appeal. *Id.* at 39. The Court of Appeals of Indiana reversed the termination of parental rights, finding that the mother had made substantial progress toward reunification with the child, and the adoption was set aside. *Id.* at 40. Two years later, the State moved again to terminate the mother's rights based on the threat that continuation of the parent-child relationship posed to the child's well-being. *Id.* at 41-42. The termination hearing focused on the child's "trauma response" to the mother, the emotional and physical stress that the extended reunification process was putting the child through, and the safe and permanent home that the child had with his foster family. *Id.* at 42. The trial court again terminated the mother's parental rights, and the Court of Appeals again reversed. In its opinion, the court stated that the "significant anxiety and behavioral problems" that the child suffered were "insufficient reason to break the parent-child relationship," especially where these problems were "not the result of anything Mother did or did not do." *Id.* at 44-45. The court further held that "the importance of permanency and stability in a child's life *** alone cannot trump the fundamental and constitutional right parents have to the care and custody of their children." *Id.* at 45. And to allow "DCS to remove a child from its parent, stall reunification until there is no relationship left, and then claim reunification cannot occur because of the lack of relationship would set a terrifying precedent." *Id.* at 45-46. Thus, while "reunification could have serious psychological and emotional ramifications" for the child, it was nonetheless required by law. *Id.* at 46.

¶ 49    We likewise find that the significant behavioral and emotional challenges that face the boys do not provide a sufficient basis for termination of T.S.'s parental rights. Although the evidence points overwhelmingly to a need for permanency and stability in the boys' lives, this need for permanency does not override T.S.'s fundamental right to parent her children. While this outcome is certainly painful for all parties involved, it is required by law.

¶ 50    The minors argue, and the State agrees, that there is no willfulness requirement in section 1(D)(m) of the Adoption Act. Thus, they argue, this court can affirm the circuit court's findings even if T.S.'s failure to make progress was not the result of her intentional refusal to comply with court directives. In its ruling, the circuit court cited to *In re M.I.*, 2016 IL 120232 for the proposition that a parent need not be "at fault" in order for the circuit court to make a finding of failure to make reasonable progress.

¶ 51    In *M.I.*, our supreme court considered whether there was a state of mind requirement regarding a parent's failure to maintain a reasonable degree of interest in or concern for a child under section 1(D)(b) of the Adoption Act. *Id.* ¶ 26. Our supreme court held that

> "the plain meaning of the phrase '[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare' in subsection (b) includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply." *Id.* (quoting 750 ILCS 50/1(D)(b) (West 2014)).

Thus, while section 1(D)(b) requires the circuit court to examine the circumstances under which a parent has failed to demonstrate concern for the child, the court need only determine whether those circumstances provide a valid excuse for this failure. *Id.* ¶ 29. In *M.I.*, our supreme court found

16

that the father's failure to attend visitation appeared to be the result of his voluntary decision making, rather than his intellectual disability and poverty. *Id.* ¶ 31.

¶ 52    We find that *M.I.* is inapposite. Here, the issue is not whether T.S.'s failure to make progress was "faultless," but whether she failed at all. Most of the evidence recounted by the circuit court in its ruling focused on the boys' troubled mental states and the serious behaviors they displayed as a result. The circuit court did not name any specific acts or omissions by T.S. that formed the basis for its finding under section 1(D)(m). The CCJCC report stated that while the boys' emotional and behavioral issues were a risk to reunification, T.S. had improved in her ability to discipline the boys and engage with their emotions. Sellers testified that T.S. successfully completed nearly every service for which she was referred, including individual therapy, parent coaching, substance abuse treatment, and parenting classes. The only incomplete services were CPP, which was terminated due to Agency staffing issues, and family therapy, which was terminated by Dr. Brosnan. The testimony from Dr. Brosnan, K.C., and Sellers also showed T.S. repeatedly *progressed* to increased, unsupervised visitation through consistent attendance and positive in-visit experiences. However, visitation would be subsequently reduced by the Agency due to *the boys'* negative response.

¶ 53    At the fitness hearing, the only evidence that T.S. failed to progress in any service came from Dr. Brosnan. We find that this evidence is insufficient to demonstrate that T.S. failed to make reasonable progress in family therapy. Dr. Brosnan gave contradictory testimony regarding the termination of family therapy. At first, she stated that she stopped the therapy due to an increase in the boys' behaviors, but later she testified that therapy was terminated due to T.S.'s failure to progress. The basis for Dr. Brosnan's opinion that T.S. was not progressing in family therapy was that T.S. was quiet and did not utilize the "sentence stems" handout proposed by Dr. Brosnan to

17

increase her conversations with the boys. Dr. Brosnan did not give any further details regarding what specific milestones T.S. failed to meet or issues she failed to address in family therapy. Instead, much of Dr. Brosnan's testimony focused on the boys' emotions and behavior. Where there was conflicting credible testimony regarding T.S.'s participation level in family therapy sessions, and where the testimony showed that T.S. consistently attended therapy and called Dr. Brosnan to discuss the therapy, T.S.'s failure to use the "sentence stems" handout does not provide clear and convincing evidence that she failed to make reasonable progress in family therapy.

¶ 54        B. T.S.'s Failure to Improve the Boys' Behavior Was Not Unreasonable

¶ 55    On appeal, the State and minors argue that T.S. was required to mitigate the boys' aversion to her visits in order to make progress in the "dynamic condition" of their behavioral issues that evolved over the course of their placement in foster care. The State and minors do not explain how T.S. could progress in addressing a situation that only occurred out of her presence at the foster parents' home. The objective standard by which progress must be measured is "reasonableness." It would be unreasonable for this court to hold that T.S. was required to resolve a condition that did not occur during the visits or therapy sessions for which she was present. It would also not be reasonable to expect T.S. to remedy the boys' behavioral outbursts in six family therapy sessions over three months, when these behavioral issues had been ongoing for over a year and had not resolved over the course of at least 50 individual therapy sessions each with Dr. Brosnan and K.C.

¶ 56    Further, T.S.'s failure to improve her bond with the boys was not unreasonable. K.C. testified that she did not explain to the boys that she and her husband were not the boys' natural parents, nor did she explain that T.S. was the boys' natural mother. CPP, the Agency-recommended therapy to establish a bond between T.S. and the boys and provide an understanding of their relationship and the foster care situation, was cancelled due to staffing issues after three or

four sessions, which even Dr. Brosnan conceded was not sufficient to show its efficacy. Family therapy with Dr. Brosnan, the foster parents, T.S., and the boys, was cancelled after six sessions. Implementation of unsupervised visitation was repeatedly delayed and scaled back when K.C. reported behavioral issues in the boys. Again, due to staffing issues, T.S. was never allowed to visit with the boys in more relaxed settings outside of the Agency, not even a park or T.S.'s home. All of these factors inhibiting the development of maternal-child bond were outside T.S.'s control. T.S. was additionally given limited and disjointed opportunities to address this issue. Thus, it was inevitable that the boys would not be able to form a secure bond with T.S. Under these circumstances, we find that it was not unreasonable that T.S. could not progress in building a relationship with the boys.

¶ 57    The evidence clearly establishes that T.S. had made progress towards reunification. It is undisputed that T.S. succeeded in her services and remediated the conditions that led to the boys' removal. T.S.'s awareness and parenting skills were determined to have quantifiably increased over the course of this case. T.S. was consistent and appropriate in visitation, although her ability to progress in visitation was hampered by an inability to visit outside of the Agency and by concerns about the boys' behavior. To the extent that termination of family therapy can be attributed to T.S., when the termination of family therapy is viewed with respect to the totality of the evidence, it cannot be said that T.S. failed to make reasonable progress towards reunification. It was the boys who were regressing as they continued to develop a bond with their foster parents instead of T.S. during the formative years of their childhoods. The circuit court improperly based its finding of unfitness on the boys' lack of progress toward reunification, not T.S.'s. We therefore find that the circuit court's finding that T.S. failed to make reasonable progress towards reunification with the boys was against the manifest weight of the evidence.

¶ 58    The dissent contends our analysis is flawed because we ask and answer the wrong question when we reverse on the basis that T.S. completed each of her services (save family therapy). Not so. If that was the question before us, then this case would leave little for us to decide, for even the minors and State concede that point. The dissent correctly notes that the question before the trial court was whether T.S. had progressed to being able to care for the boys. We find that it was error for the trial court to answer this question based on the boys' ongoing behavioral issues that occurred with the foster parents outside of T.S.'s presence, rather than basing its finding on any skills, actions, or emotions T.S. failed to develop or implement.

¶ 59    The dissent states that our emphasis on T.S.'s completion of services results in a "mechanical" review of the circuit court's ruling. But compliance with these service plans provides an important, albeit not the only, benchmark against which to measure T.S.'s progress. Each of these services was put in place specifically to identify and address T.S.'s parenting deficiencies. T.S. did not merely attend and complete all services; as the CCJCC report and evaluations from T.S.'s therapist and parenting coach found, completion of these services resulted in measurable improvements to T.S.'s parenting abilities. Thus, when the dissent states that no witness testified that T.S. was equipped to care for the boys, it discounts not only the testimony of T.S. herself, whom the circuit court found credible, but a comprehensive parenting assessment that specifically evaluated T.S.'s parenting capacity *relative to her children's needs* and found improvement. In addition to her completion of assigned services, there is testimony from several witnesses regarding T.S.'s progress in visitation, during which she parented the boys appropriately. *Supra* ¶ 52. The manifest weight of the evidence regarding T.S.'s thoughts, behaviors, actions, and inactions over the course of this case demonstrates that T.S. progressed towards reunification with

the boys. What the manifest weight of the evidence showed regarding the best interest of the boys is therefore of no moment.

¶ 60    Moreover, to the extent that the circuit court found T.S. unfit because she did not progress in bonding with the boys, that failure was reasonable. It is an overly simplistic and, indeed, mechanical view when the evidence shows that T.S. never had a chance to form the kind of bond with the boys required by the circuit court. *Supra* ¶¶ 55-57. To hold that she is unfit because she didn't make reasonable progress in forming the kind of bond with the boys required by the circuit court under these circumstances cannot be squared with the letter and spirit of the Adoption Act.

¶ 61         C. T.S. Demonstrated Reasonable Interest in And Responsibility for the Boys

¶ 62    The circuit court also found that T.S. was unfit to parent D.L. and C.L. because she failed to maintain a reasonable degree of care, concern, or responsibility for the minors under section 1(D)(b) of the Adoption Act. The circuit court based this finding on the fact that T.S. only placed four phone calls to the foster parent over a year. On appeal, the State and the minors argue that T.S. failed to show a reasonable degree of responsibility for the minors by acting "passively" in family therapy with Dr. Brosnan. We find that it was against the manifest weight of the evidence for the circuit court to find that T.S. did not maintain a reasonable degree of care and concern for the boys.

¶ 63    In determining whether the evidence supports a finding of unfitness under section 1(D)(b), a "court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." *Syck*, 138 Ill. 2d at 279. The court must place the parent's efforts in the context of the circumstances in which their conduct occurred. *Id.* at 278. The court must look at the entire period between loss of custody and the fitness hearing when making a finding under this section. *J.O.*, 2021 IL App (3d) 210248, ¶ 37.

21

¶ 64    In November 2017, T.S. was tasked with calling K.C. weekly. T.S. stated that she did so; K.C. testified that T.S. called her four times between November 2017 through June 2018. Both T.S. and K.C. also testified that T.S. was visiting the minors once or twice per week during this period, with one of those visits sometimes being family therapy. T.S. and the foster parents also exchanged text messages during this time.

¶ 65    Throughout the pendency of this case, T.S. had completed hundreds of hours of services, including years of individual therapy, 30 hours of parenting classes, a 55-lesson parenting coaching curriculum, and various other screenings and assessments. T.S. had been consistent with visits since 2015. T.S. would bring snacks to visits. T.S. would throw joint birthday parties for the boys. Additional context for T.S.'s circumstances include her work schedule of 50-60 hours per week, her long commute to the sessions at DePaul, and her responsibility for co-parenting E.S., who was only two years old when T.S.'s visits were finally suspended.

¶ 66    The argument that T.S. failed to show responsibility for the minors in family therapy is similarly not based on clear and convincing evidence. The only evidence that T.S. failed to put forth effort in therapy is that she did not utilize Dr. Brosnan's "sentence stems" strategy to communicate with the boys. There is conflicting testimony from Dr. Brosnan regarding the reason for the end of family therapy. At first Dr. Brosnan testified that family therapy was terminated because the minors' psychological distress was not decreasing. When Dr. Brosnan was later recalled to the stand, she stated that family therapy was terminated due T.S.'s failure to progress. There is conflicting testimony from T.S. and Dr. Brosnan as to whether T.S. engaged the minors in conversation during sessions. The circuit court found both T.S. and Dr. Brosnan credible but did not resolve this discrepancy. There is testimony from both T.S. and Dr. Brosnan that T.S. would interact with the boys during sessions. There is testimony from both T.S. and Dr. Brosnan

that T.S. demonstrated concern and responsibility by calling Dr. Brosnan outside of sessions to discuss the therapy and the boys' well-being.

¶ 67    While there is some evidence that T.S. failed to call K.C. as tasked, the entire record establishes that T.S. was consistently showing interest, concern, and responsibility regarding the boys' welfare over the course of the case.

¶ 68    In looking at the totality of the evidence, the State did not establish by clear and convincing evidence that that T.S. failed to show interest, concern, or responsibility for the boys over the period of 2014 to 2019. T.S. was consistent in visiting the boys. T.S. brought the boys snacks and played appropriately with them at visits. T.S. completed all recommended services except for CPP and family therapy, which were beyond her control. T.S. communicated with K.C. by text and threw birthday parties for the boys. T.S. communicated with Dr. Brosnan outside of family therapy sessions. T.S.'s inconsistent phone calls to K.C. from November 2017 to June 2018, during which period she was otherwise seeing the boys regularly and text messaging K.C., and T.S.'s failure to use the "sentence stems" strategy in family therapy, are not clear and convincing evidence of an unreasonable degree of interest in or concern for the boys' welfare.

¶ 69                                  III. CONCLUSION

¶ 70    For the foregoing reasons, the judgment of the circuit court is reversed. We acknowledge that reunification may have serious emotional and psychological effects on D.L and C.L. We do not take these concerns lightly. The alternative, however, is worse because it would deny a fit, able, and loving parent the right to parent her children. This is a painful decision. We cannot make up for the years that T.S. has lost with D.L and C.L. and cannot give D.L and C.L. the future they may desire with their foster parents, who by all accounts opened their hearts to the boys. What we

can and must do, however, is follow the law, which requires that T.S.'s parental rights over D.L. and C.L. be restored. We do so today.

¶ 71    We remand this case to the circuit court for further proceedings consistent with this opinion.

¶ 72    Reversed and remanded.

¶ 73    PRESIDING JUSTICE MIKVA, dissenting:

¶ 74    The trial court in this case found that T.S. was an unfit parent primarily on the basis of her failure to make progress toward the return of her two sons during multiple nine-month periods. The majority reverses the finding of unfitness. I dissent.

¶ 75    The standard for our review of the factual finding made by the trial court that T.S. is an unfit parent is the manifest weight of the evidence. As our supreme court has made clear:

> "[A] finding of unfitness will not be reversed unless it is against the manifest weight of the evidence *** [because] the trial court's opportunity to view and evaluate the parties *** is superior to that of a reviewing court. [Citation.] A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 21.

¶ 76    I cannot think of a situation in which this deferential standard of review is more appropriate. At the time that this judge terminated T.S.'s rights, on January 11, 2022, he had presided over this case for nearly eight years—since April 17, 2014. He had held numerous hearings, including at least five permanency hearings in which he maintained the return home goal so that T.S. could continue to get services, to visit regularly with the boys and to hopefully make the necessary progress to make their return home possible. Before this trial judge moved away from the return

24

home goal, in August of 2018, he held a multi-day hearing in which he reviewed the entire history of the case and numerous documents, and then provided the parties with a detailed explanation for the goal change. The trial court, at T.S.'s request, continued the termination hearing from March of 2020 until September of 2021 so that the hearing could be held in person. This judge took an extraordinary amount of care to ensure that T.S. had every opportunity to regain custody of her sons and his factual findings were carefully explained and fully supported by the record.

¶ 77     As we have noted in other cases, "due to the delicacy and difficulty of child custody cases *** wide discretion is vested in the [juvenile court] to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." (Internal quotation marks omitted.) *In re M.W.*, 2019 IL App (1st) 191002, ¶ 50. See also *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27. This enhanced deference is particularly necessary here.

¶ 78     The majority in this case has determined that the trial court's finding that T.S. is unfit was against the manifest weight of the evidence only because the majority has asked and answered the wrong question. The relevant question is not whether T.S. has successfully completed most or even all of the services assigned to her, it is whether the completion of those services has resulted in reasonable progress towards the return home of her children.

¶ 79     Subsection (m) of the Adoption Act's definition of an "[u]nfit person" includes the following as a ground for finding that a parent is unfit:

> "Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent

during any 9-month period following the adjudication of neglected or abused minor

under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under

Section 2-4 of that Act." 750 ILCS 50/1(D)(m) (West 2016).

¶ 80    The majority concludes that T.S. must have made progress since she completed all the

services set forth in her service plans, with the exception of family therapy. *Supra* ¶ 45. But, as

our supreme court has made clear, "mechanical application of a rule that measures a parent's

progress only in terms of compliance with the service plans [can] produce unjust results." *In re*

*C.N.*, 196 Ill. 2d 181, 215 (2001). Rather, "the overall focus in evaluating a parent's progress

toward the return of the child remains, at all times, on the fitness of the parent in relation to the

needs of the child." *Id.* at 216. As the statute says: the progress must be toward "the return of the

child."

¶ 81    As our cases have made clear, reasonable efforts and reasonable progress are distinct

concepts. Reasonable efforts are judged subjectively, based upon the amount of effort that is

reasonable for the particular parent. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. By contrast,

reasonable *progress*—which is what is at issue here—is judged objectively and is defined as

"demonstrable movement toward the goal of reunification." *C.N.*, 196 Ill. 2d at 211. The trial court

acknowledged that T.S. had made reasonable *efforts* by completing numerous services. But the

trial court concluded that she was unable to make reasonable *progress* towards return home of her

boys because despite those efforts she could not create a bond with them, make them feel safe with

her, or overcome the trauma of their earlier experiences.

¶ 82    As the majority acknowledges, this case was screened into court because D.L, T.S.'s older

son, was diagnosed with a failure to thrive, there was domestic violence between the parents, and

T.S. locked herself in a closet with knives and threatened to kill herself. *Supra* ¶ 5. This recitation

of the background omits the fact that T.S. texted the boys' father: "you leave me alone with these kids; you're not going to be happy until these mother fuckers are dead." Thus, the violent relationship between the parents included a threat by T.S. to kill her sons. The majority's recitation of the facts also omits that, before the case was screened into court, beginning in July of 2013, when it first learned of T.S.'s failure to thrive, DCFS put services in place to try to maintain the boys in the home with their parents. This was the situation when the violent incident between the boys' parents in March of 2014 brought the case into court. In my view, these omissions from the background downplay the significance of the boys' trauma and the efforts that were made to preserve T.S.'s relationship with her sons.

¶ 83     The majority also downplays the significance of the reports from the Children Research Triangle (CRT) by noting that the "main background source" was the boys' foster mother. *Supra* ¶ 31 and n.3. These reports were relied on heavily by the trial court judge, both when he changed the goal and when he found T.S. had failed to make progress. These reports indicate that the licensed clinical psychologists, both holding degrees as doctors of psychology, who completed these evaluations gathered information from the caseworker, numerous documents, and particularly the boys themselves, as well as from their foster mother. I see no indication that the foster mother was the "main" source of any conclusions in these reports.

¶ 84     The CRT reports explained the ways in which the boys continued to suffer from the time that they had spent with their biological parents. The report on D.T. noted that he:

> "likely learned there was little he could do to get his even most basic needs met. Instead of being able to do something (e.g. cry, get upset, etc.) that would result in a reaction and support from his biological parents, it instead resulted in his continuing to be ignored and not provided with what he needed. Regretfully, these

early experiences helped form the way that [D.L.] experiences and copes with situations with which he is faced today. [D.L] presents with significant anxiety."

¶ 85    The report on C.L. noted, as the trial court pointed out, that his early neglect and exposure to violence "placed him at an increased risk for a range of difficulties." The trial court also relied on the CRT report to conclude that T.S. was "essentially a stranger" to C.L when she visited him and that "his history of early trauma and relational disruption *** likely intensified his anxiety."

¶ 86    The majority discounts any testimony by Dr. Brosnan or the foster mother. Both of these witnesses testified in detail as to how visits with T.S. traumatized the boys. Dr. Brosnan explained how T.S. failed to make any progress in family therapy towards establishing a bond with her boys or even engaging with them, being able to calm their anxiety, or being able to control their behavior. The trial court specifically found that these were credible witnesses, and we are compelled to defer to the trial court's credibility findings (*In re A.B.*, 308 Ill. App. 3d 227, 240 (1999)).

¶ 87    The majority rejects ground (m) as support for the trial court's finding of unfitness because, in its view, "the central basis for the court's finding was that *the boys* were not making significant progress in reducing their reactions to T.S.'s visits." (Emphasis in original.) *Supra* ¶ 47. But the question before the trial court was whether the mother had made progress toward return home of the boys—had she progressed towards being able to care for them? There was ample evidence to support the trial court's finding that she had not and there was not a single witness who testified that she was bonded with or equipped to care for these boys with high needs who still clearly suffered from the trauma of their early life with their biological parents.

¶ 88    The majority blames the lack of a bond on the fact that visits, even those that were unsupervised, were mostly at the agency. *Supra* ¶ 60. However, there was testimony from several

28

witnesses that this was done because of concern about T.S.'s ability to control the boys' behavior. Indeed, the clinic report also recommended that any unsupervised visits occur initially at the agency and once they "go well" at the agency, "community visits can be introduced." There was no testimony that this ever occurred.

¶ 89     The majority finds our supreme court's decision in *In re M.I. v. J.B.*, 2016 IL 120232 to be "inapposite." *Supra* ¶ 52. There the court held that subsection (b) of the unfitness definition, "includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply." *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 26. Thus, a parent may be found unfit despite being willing to and making efforts to comply—there is no exception for a faultless failure. As our court has recognized, this applies equally to a failure to make progress under ground (m). *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 61.

¶ 90     The majority insists this is not a case of a faultless failure, because T.S. simply did not "fail" to make progress. However, the way that the majority measures her progress—with no deference to the trial court's finding to the contrary—is simply wrong. The majority asks only if T.S. did all that was asked of her and completed a number of services successfully. The failure, as found by the trial court, was that despite the completion of those services, T.S.—unfortunately and perhaps through no fault of her own—did not make progress toward overcoming the significant barriers that still existed to the boys' return home. This finding was, in my view, fully supported by, and not against the manifest weight of, the evidence.

¶ 91     I dissent.