2024 IL App (1st) 230661-U

SECOND DIVISION
January 30, 2024

No. 1-23-0661

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* E.L, E.L., and C.C., Minors, | ) | |
| | ) | Appeal from the |
| Minors-Respondents-Appellees | ) | Circuit Court of |
| | ) | Cook County |
| (People of the State of Illinois, | ) | |
| | ) | 17 JA 549 |
| Petitioner-Appellee, | ) | 17 JA 551 |
| | ) | 17 JA 954 |
| v. | ) | |
| | ) | Honorable |
| K. O-P., | ) | Patrick Murphy, |
| | ) | Judge Presiding |
| Mother-Respondent-Appellant.) | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirmed. Court's finding that mother is unfit was not against manifest weight of the evidence.

¶ 2     Appellant K. O-P. is the mother of 5 children, the three youngest of which are the subject of this appeal. After nearly 5 years of services, the State sought to terminate Mother's parental rights for failure to maintain responsibility for the children's welfare and failure to make reasonable progress towards their return. After trial, the circuit court concluded that Mother was unfit under both grounds. She now appeals these findings of unfitness. (She does not challenge

the court's best interest finding.) For the reasons stated below, we conclude that the court's finding that she failed to make reasonable progress is supported by the evidence. As such, we need not address the second ground. We affirm.

¶ 3                                    BACKGROUND

¶ 4      This case first came into the system in 2017 after reports that Mother's children were being physically abused—both by Mother and her then-boyfriend. Although she has five children, this case involves the state's petition to terminate parental rights for the three youngest, E.L, E.L, and C.C. (collectively, the Minors). In mid-2018, the Minors were placed in the custody of DCFS. From 2018 to 2021, Mother engaged in services with the goal of attaining reunification. Around May 2021, however, this goal switched to termination.

¶ 5      It was not until February 2022 that the State filed their petitions to terminate Mother's parental rights over the Minors. The petition alleged that Mother had failed to maintain a reasonable degree of interest, concern, or responsibility for the Minors' welfare (see 750 ILCS 50/1(D)(b)) (West 2020) (Ground B) and failed to make reasonable progress towards the Minors' return during a 9-month period after the adjudication of dependency (see *id.* § 50/1(D)(m)) (Ground M). As of December 2022, the State alleged Mother failed to make progress from: July 1, 2018 to April 1, 2019; April 1, 2019 to January 1, 2020; January 1, 2020 to October 1, 2020; October 1, 2020 to July 1, 2021; and July 1, 2021 to April 1, 2022.

¶ 6      The court conducted the fitness hearing in March 2023. During this hearing, the State limited its arguments to a few specific theories. As for Ground B, it only claimed Mother failed to take responsibility for the Minors' welfare. For Ground M, the State's theory was that although Mother had completed services, she'd failed to actually make progress because her behavior never changed.

¶ 7    During the hearing, the court heard from several witnesses. The case worker, Rosa Vargas, and case supervisor, Brenda Burciaga, testified consistently with one another. From 2018 to the fall of 2020, Mother had supervised visits with her children. About "70 to 80 percent of the visits would start off well." However, near the end there would be some "more concerning behavior." According to the workers' testimony, this pattern stayed consistent throughout the entire case.

¶ 8    For the vast majority of visits, Mother was unable to maintain composure and manage her children. "Maybe 20 or 30 percent of the time mom would do great, she would be able to give the kids who were struggling, like, emotionally or they were trying to do something and they weren't able to, she would start redirecting them." If she wasn't able to redirect them, however, she would start yelling at the children and escalating the situation. Mother's yelling would upset the children, particularly one of them. This child would, for example, start crying and "hide underneath the table and won't want to come out." Instead of trying to calm him down, she "gets escalated herself and it becomes like a yelling match. She just yelling [*sic*] at him to listen to her, that she doesn't understand why he acts that way." When the case worker would try to step in and help Mother, she would only accept help about "30 percent of the time." The rest of the time, Mother would simply ignore Vargas's suggestions.

¶ 9    The majority of Mother's "concerning behavior" were comments she made towards the children. In one instance, early in the case, Mother told the eldest daughter that "it was because of her that they weren't living with her and why they were in foster care." Another time she yelled at one of the younger children that "I don't know why you act like that, you never acted like that when you were with me. I don't know what they're teaching you in that foster home, I don't know what they allow you to do."

¶ 10    Mother's hostility towards agency staff and the foster parents was also a significant theme in the agency worker's testimony. Burciaga testified that Mother was "not receptive" to help during the visits because they "were her kids." When the workers intervened to help Mother, she would stop yelling at the kids and redirect her anger towards agency staff. In one instance, Mother threatened to harm Burciaga's unborn child with witchcraft.

¶ 11    At one point, in the latter half of 2020, Mother was briefly granted unsupervised visits with the children. However, these unsupervised visits were cancelled after police were called to Mother's house because of an altercation between her and a foster parent. This incident helped solidify the agency's decision to change its recommendation from reunification to termination. Burciaga testified that the recommendation was changed because, while Mother "engaged or already complete[d] some services, she was not implementing what she had been learned [*sic*] on those services, like parenting classes, parenting coaching, therapy, nothing seems like she was able to improve."

¶ 12    Mother also testified during the hearing. Generally, she testified, consistently with the other witnesses, that she had been engaging in services. She discussed her psychiatric treatment as well as individual, domestic violence, and parenting counseling. She testified, as did the case workers, that she completed nearly all the services offered to her. At the end of her direct examination, the court allowed Mother to give a narrative explanation of anything she "want[ed] to tell" the court. During this narrative, she noted all the services she had completed but also stated that, in her view, the agencies "never respected my rights and my visits."

¶ 13    At the close of testimony, the State put in a significant number of exhibits, many of which were the written service plans and reports referenced, albeit briefly, during trial.

¶ 14    The case then proceeded to closing argument. As noted, the State's contention was that despite all the completed services, Mother's behavior hadn't changed.  She, on the other hand, contended that the workers' dislike for her was unfairly being used to justify taking away her children. Defense counsel reiterated the court's concerns during trial that certain "incidents" were too minor to show unfitness—essentially, that the State was making mountains out of molehills. Basically: "[t]his is a mother that is essentially being punished for being perceived as being obnoxious. No more, no less."

¶ 15    The State responded, however, that chalking up the claims of a lack of progress to a personality dispute "might be the case if it was only one service provider or one person who had that opinion." The State noted that Mother's "Howard Counseling therapist had an opinion that she hadn't made progress," that "[h]er therapist from Bright Star made that opinion in 2022," as did "[h]er therapist from Association House in 2021. Those are not only three different therapists, but three different agencies. The Cook County Juvenile Court Clinic did two assessments by two different clinicians. Those are unbiased, impartial evaluators."

¶ 16    The court often interjected during two rounds of argument on this case. In particular, the circuit court was reluctant to find lack of progress given Mother's compliance with her therapies and seldom missed any visits. Ultimately, though, the court agreed she had not progressed. The court reached this decision because

> "in this case, it's -- I find that the mother -- and as I say, it's the most difficult thing I can ever do -- is unfit because of the grounds D and M. She did not make progress.
>
> And she made no progress, even though she went to the classes, and even though she visited the kids, I rely on the professionalism of the workers. And we saw here in court too, mother – it's not that she won't accept responsibility. It's that everybody is

wrong. And you take that point of view -- as I said, believe me. I've represented parents. I've represented kids here.

Any parent, in my judgment, who wants to get their kid back, would walk over a mountain of cut glass barefoot to get that child back. And if you're fighting with the Department over everything, it's like telling me hey, I'm really – it's about me. It's not about the child.

And so there was no progress in this case. I think the mother, it was about her and not the kids, based on the evidence that I heard.

And so based on that, despite the fact that she made the classes, but it was always about her. It's clear that's what the workers were testifying to. I'm going to find there was no progress, and I'm finding the mother unfit on those grounds."

¶ 17    The case then proceeded to the best-interests portion of the termination hearing. We need not go into detail, as Mother does not challenge the best-interest finding on appeal, except to note that the court deemed it in the best interests of the Minors to terminate Mother's parental rights.

¶ 18    Mother timely appealed the court's decision.

¶ 19                             ANALYSIS

¶ 20    Mother argues that the findings of unfitness on Grounds B and M were against the manifest weight of the evidence, as the record shows that she completed all the services offered to her, and the case reports show she was making progress. The State responds that the service plans are rife with examples where she consistently failed to improve despite her completion of services. For the following reasons, we find the court's finding on Ground M, failure to make reasonable progress, is supported by the record. As such, we need not address Ground B. See *In*

*the Interest of Y.F.*, 2023 IL App (1st) 221216, ¶ 31 (appellate court may affirm court's judgment on single ground, regardless of its finding on others).

¶ 21    Parental rights are " 'perhaps the oldest of the fundamental liberty interests' recognized by the United States Supreme Court." *In re D.L, Jr.*, 2022 Ill (App 1st) 220222, ¶ 39 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Cases seeking to terminate this right are *sui generis*—unique unto themselves—and must be considered on their own facts. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006).

¶ 22    In Illinois, terminating parental rights is a two-step process. First, the State must prove by clear and convincing evidence that a parent is unfit as defined in section 1(D) of the Adoption Act. See 750 ILCS 1/1(D) (West 2020); *In re D.D.*, 2022 IL App (4th) 220257, ¶ 27. After a finding of unfitness, the question then turns to whether termination is in the best interest of the child. *In re C.E.*, 406 Ill. App. 3d 97, 107 (2010). As noted, Mother is not challenging the second question and instead focuses solely on the court's findings of unfitness. We must be careful not to allow the question of best interests to weigh into the consideration of unfitness. *In re D.L., Jr.*, 2022 IL App (1st) 220222, ¶ 46; see also *In the Interest of Y.F.*, 2023 IL App (1st) 221216, ¶ 29.

¶ 23    Ground M provides two independent bases to find a parent unfit: (1) the failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child *or* (2) the failure to make reasonable progress toward the return of the child. *In re C.N.*, 196 Ill. 2d 181, 210-11 (2001). This case involves the latter—progress. Whether a parent has made reasonable progress is an objective standard. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 38. Reasonable progress is shown by demonstrating movement towards the goal of reunification. *Id.*; see also *In re C.N.*, 196 Ill. 2d at 211. A parent has shown reasonable progress when a court can conclude

that the child may be returned to their parent " 'in the near future.' " *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1067).

¶ 24 In order to reverse a court's finding of unfitness, we must conclude that it was against the manifest weight of the evidence—that the opposite conclusion is clearly evident. *In re C.N.*, 196 Ill. 2d at 208. Because of the unique nature of these cases, we give the circuit court's termination decision "great deference." *In re D.D.*, 2022 IL App (4th) 220257, ¶ 28.

¶ 25 Here, Mother's argument emphasizes the notion that she complied with all the service plans. Compliance with service plans is critical, but it is not enough, by itself, to show reasonable progress—our supreme court has explicitly said so. *In re CC*, 196 Ill. 2d at 215-16. The question of progress encompasses more than service plans. Courts must consider "the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17. While compliance with the services plans plays a central theme in her argument, her specific contention is that there was not *clear and convincing* evidence she was unfit, because the case reports show she was progressing in therapies.

¶ 26 As a reminder, this case came into the system due to evidence that Mother had been physically abusing her children. Despite this, she correctly notes that the reports indicate that she "has shown that she can be nurturing and caring with her children." Much of her frustration was because she believed the caseworkers unfairly demonized her. But the reports note that she "started working on controlling her anger and frustration." And several reports even indicate that [s]ince this worker started working this case, [mother] has [sic] appears to be making some progress."

¶ 27    The problem is that in the status reports, for every comment about Mother completing services and making progress, there are just as many or more about her litany of failures. Several consecutive reports indicate that, while Mother had completed Domestic Violence counseling, "her behavior has not changed." And though she has completed her parenting classes, "it is evident that she has not made progress in parenting services as her visits have been suspended on more than one occasion due to [her] behavior." Another one: "[Mother] is engage [*sic*] in services, but she needs to apply skills learned to demonstrate seriousness about reunification."

¶ 28    These findings stay consistent over several status reports—at least, throughout the June 2018, December 2018, June 2019, and November 2019 status reports (well over 9 months and encompassing several 9-month periods asserted by the State).

¶ 29    The evidence also shows that Mother regressed during the several years she had been engaging in services. In fact, one of these regressions was the impetus to change the case goal from reunification to termination. While there had been bumps along the road, around Fall 2020 Mother regained the right to have unsupervised visits with her children—undoubtedly progress towards reunification. But that quickly changed because the police were called to her home during a visit. (The record is not entirely clear on *why* the police were called, but Mother claimed it was because of a disagreement with one of the foster parents.) Needless to say, unsupervised visits were cancelled and, shortly thereafter, the case goal changed to termination.

¶ 30    But there is also one other crucial area in which Mother failed to make progress: domestic violence counseling, the reason that the case came into the system in the first place. The record shows little if any progress toward correcting that behavior, despite years of therapy. Indeed, at least one report shows that she still actively maintained abusive tendencies. In the June 2020 report, the evaluation states: "Mother has successfully completed the Domestic Violence

counseling, however, there is [a] current investigation pending against [her] for physical abuse against [her] boyfriend [*sic*] child Justin. [Mother's] behavior has not changed."

¶ 31    The court here was anything but a rubber stamp; the court challenged the attorneys and questioned them at all stages, most intensely during closing argument. The court ultimately found the caseworker witnesses to be professional and credible and agreed with their claims that Mother had not made reasonable progress toward reunification. That finding is not against the manifest weight of the evidence; the opposite conclusion is not clearly evident.

¶ 32    While the court did not apportion its findings to any specific 9-month period, the evidence supports the conclusion regarding each of the 9-month periods at issue, as the State argued. The court was well within reason to conclude that Mother's behavior never meaningfully changed—either because of inability or refusal—despite the fact that she engaged in services for approximately five years before the final termination. Without demonstrable improvement after this length of time, the court's belief that she could not (or would not) change is far from unreasonable. See *In re C.E.*, 406 Ill. App. 3d at 108 (after four years in system, it was apparent that mother could not protect children from abuse and neglect). It was ultimately the circuit court's duty to weigh the evidence and decide whether Mother has, objectively, made reasonable progress towards reunification. As our courts have said numerous times, that decision is entitled to "great" deference. See *In re D.D.*, 2022 IL App (4th) 220257, ¶ 28. There is simply no basis in the record for us to second-guess the court's judgment that Mother was unfit under Ground M.

¶ 33                                    CONCLUSION

¶ 34    The judgment of the circuit court is affirmed.

¶ 35    Affirmed.